# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

Global Wealth Investments, Inc.,

        Plaintiff,                                                          Case No.  1:14cv587

        v.                                                                            Judge Michael R. Barrett

Shaun L. S. Donovan
Secretary, Department of Housing
and Urban Development, *et al.*,

        Defendants.

## OPINION & ORDER

This matter is before the Court upon Plaintiff Global Wealth Investments, Inc.'s Motion for Summary Judgment (Doc. 28) and Defendant Secretary, Department of Housing and Urban Development's Motion for Summary Judgment (Doc. 39).  These motions have been fully briefed.  (Docs. 40, 48, 49, 52).

Also before the Court is Defendant Secretary, Department of Housing and Urban Development's Motion to Strike the Affidavit of Rasheed Shamma.  (Doc. 31).  Plaintiff has filed a Response (Doc. 47) and Defendant has filed a Reply.  (Doc. 54).

## I.    BACKGROUND

Plaintiff claims Defendant, Secretary of the United States Department of Housing and Urban Development ("HUD"), violated the Administrative Procedure Act, 5 U.S.C. §§ 551-559 ("APA"), when HUD failed to abide by Section 8 of the United States Housing Act of 1937, 42 U.S.C. 1437f, its associated regulations and HUD guidance ("Housing Act").

On March 12, 2013, Plaintiff entered into a contract to purchase a ten-unit

residential apartment building ("the Property" or "Rockdale Apartments") owned by Brican Properties. Brican's president was Terrence Sebastian. Since 2008, Brican had received subsidy payments from HUD to assist low-income families living in the apartments. These payments were pursuant to a Housing Assistance Payment Contract ("HAP Contract"). Plaintiff claims that it relied on the existence of the HAP Contract in deciding to purchase the Property, and anticipated that the HAP Contract would be assigned from Brican to Plaintiff. The HAP Contract provides for assignment in Section 27a:

> HUD will approve a change of ownership during the term of this Contract only if the purchaser demonstrates, to HUD's satisfaction, an ability to administer this Contract and agrees to carry out all terms of this Contract.

(Doc. 20, HUD Administrative Record, (hereinafter "HUD"), HUD 6).

Payments were made pursuant to section 4(d)(2) of the HAP Contract, which states:

> Housing assistance payments shall only be paid to the Owner for contract units occupied by eligible families leasing decent, safe and sanitary units from the Owner in accordance with statutory requirements, and with all HUD regulations and other requirements . . .

(HUD 43-44). These statutory requirements include Section 8 of the Housing Act and HUD's implementing regulations. *See* 42 U.S.C. § 1437f(c)(4); 24 C.F.R. §§ 5.703, 886.123(a). To ensure that HUD housing is "decent, safe and sanitary," HUD's regulations provide for annual physical inspection of the housing by HUD's Real Estate Assessment Center ("REAC") "unless the program regulations governing the housing provide otherwise or unless HUD has provided otherwise by notice." 24 C.F.R. § 5.705.

Before the Property was owned by Brican, the Property failed inspections in 2007 and 2008. (HUD 56, 70). As a result, the Property was referred to the HUD's

Enforcement Center, and the owners of the Property were required to certify that all of the deficient conditions were corrected.  (HUD 60, 83).  After the Property was owned by Brican, the Property failed another inspection in January of 2010.  (HUD 157).  On April 22, 2010, HUD notified Brican it was in default of the HAP Contract for failing to maintain the Property in a decent, safe and sanitary condition.  (HUD 172).  In order to avoid termination of the HAP Contract, HUD specified numerous corrective actions that Brican was required to complete.  (HUD 172-73).  Brican later certified that it had corrected all of the deficiencies.  (HUD 176-79).  On June 16, 2011, HUD sent Brican correspondence notifying it that the HAP Contract would be renewed for a three year period.  (HUD 518).

On March 27, 2013, Karrie Guare, Brican's management agent, notified HUD via email that Brican was set to close on the sale of the Property the next day and seeking information regarding the forms necessary for the new owner to change the deposits for the HAP.  (HUD 181-82, 186).  A few minutes later, Bonnie Spurling, on behalf of HUD responded:

> Is this true?
>
> We have received no information relative to the proposed new owner (2530's for owner and agent, management documents, sales agreement, organization structure of the proposed purchaser, proposed deed, HAP Assignment, plan for physical repairs/improvements – due to last REAC being under 60, certification that accounts payable are cleared, sources and uses of funds, proposed owner resume, etc.).  Please refer to Chapter 13 of HUD Handbook 4350.1 and Notice 99-13 for the specific information and documentation that MUST be submitted.

(HUD 181) (emphasis in original).  Spurling sent a second email, just a few minutes later, stating:

> We cannot process a new direct deposit form without the HAP Assignment

> process being completed.  This is the FIRST notification that we have received of a possible change in ownership.  As Mr. Sebastian knows, the HAP funds cannot be paid to other than the owner of record who must also be the ownership entity listed on the HAP Contract in effect.

(HUD 182) (emphasis in original).  The next day, on March 28, 2013, Plaintiff and Brican closed on the sale of the Property and Plaintiff became the titled owner of the Property.

On April 16, 2013, Spurling sent the email correspondence between Guare and Spurling to Rasheed Shamma, Plaintiff's Vice President via email.  (HUD 188).  In that same email, Spurling also informed Shamma:

> The documents that need to be submitted for HUD review and approval for Transfers of Physical Assets (TPA) are outlined in HUD Handbook 4350.1, Chapter 13 and Notice 99-13 is attached.  The attachments to the Notice is also included with Attachments 5-8 being relevant to the TPA.

> Also attached in a copy of the Assignment of HAP which must be completed by both Terrance Sebastian/Brican Properties and the new purchaser.  Please note that only the italicized and/or blank spaces may be changed on this form.  Any other changes will not be accepted.

(HUD 188).  Shamma responded later that same day detailing how he planned to respond to the paperwork requests and also explained:

> Terrance said as far as he knew—the items from inspections 3 years ago were all taken care of—I insisted on getting [a] copy of items that needed attention at last inspection, so we can go through and verify they were indeed taken care of prior to next inspection (if they weren't already done).

(HUD 188).  On April 18, 2013, Shamma submitted signed paperwork to Spurling and explained: "I am still awaiting list from [T]errance on scored issues so we can address those."  (HUD 192).  Later that day, Spurling emailed Shamma and repeated her instructions from the April 16th email regarding the necessary paperwork.  (HUD 197).  Spurling also attached several HUD handbooks and referenced training and websites for owners and agents.  (HUD 197).  Spurling closed the email by stating:

4

A Physical Improvement Plan is also needed due to the failing REAC physical inspections.

Until all of the above items are received, we cannot process the request to transfer the HAP Contract.

(HUD 197).

On April 22, 2013, Guare emailed the management agreement to Spurling. (HUD 357).  Spurling responded to Guare and Shamma the next day, reminding them of "the items relative to the purchaser as outlined in the 4/18/13 to Rasheed Shamma." (HUD 357).  Spurling closed the email by stating, "We cannot process the request until all of the required documents have been submitted for review."  (HUD 357).

On April 23, 2013, Shamma asked in an email for clarification about what paperwork was necessary.  (HUD 358).  Spurling responded in an email that same day explaining: "It is the items listed in the Transfer of Physical Assets, Chapter 13 of HUD Handbook 4350.1 and Notice 99-13 – there's a checklist with the items in both the Handbook and the Notice, Attachments 5 and 6.  These are attached again."  (HUD 358).  The next day, Shamma supplied a number of the requested documents and stated:

The repair inspections [sic] has been scheduled with maintenance to go through last known report of 2010 identifying the issues at that time.  Once that is completed will send you and bonnie [sic] email notifying that all items on that list were corrected or corrected at time of inspection.

(HUD 359).

On April 25, 2013, formal notice of the Property's inspection was sent.  (HUD 372-73).  The inspection was scheduled for May 22, 2013.  (HUD 359).

On April 26, 2013, Spurling sent an email to Shamma and Guare outlining information missing from the paperwork and incorrect information in the paperwork.

(HUD 379).  Spurling also explained: "No further review may be completed until the revised documents noted above have been submitted."  (HUD 380).

On May 13, 2013, Guare requested that the inspection be rescheduled.  (HUD 399).  Guare stated that "it is still unclear with HUD who the current owner is and we feel it would be in our best interest to wait until the transfer of ownership is completed before the REAC occurs."  (HUD 399).  HUD denied the request to reschedule the inspection.  (HUD 399).

HUD inspected the Property on May 22, 2013.  The inspection identified missing or inoperable smoke detectors, a blocked storm drain, an inoperable lock on the front door, holes in the ceiling, an inoperable ventilation system, leaking pipes, mold and cockroaches.  (HUD 410-445).  Plaintiff does not dispute the inspection's findings.  The Property's overall score was 13 out of 100. (HUD 401-450).  In a cover letter dated May 22, 2013, HUD explained that because the Property failed the inspection by scoring below 60, the inspection has been referred to the Department Enforcement Center for enforcement action.  (HUD 401).  The letter also explained that "[p]roperties scoring below 60 have physical deficiencies that do not meet the contractual obligations to HUD."  (HUD 401).  In addition, the letter explained: "[i]f you fail to correct the physical deficiencies, fail to correct the EHS violations, or, fail to provide HUD with the required certification within the required timeframes, or falsely certify to repairs made, these noncompliance issues may adversely affect your eligibility for participation in HUD programs."  (HUD 401-402).  Plaintiff was also provided a list of Exigent Health and Safety deficiencies (HUD 454-456), which had to be corrected within three days (HUD 401).  On May 24, 2003, Plaintiff provided a certification that all of the Exigent Health

6

and Safety deficiencies had been repaired or eliminated.  (HUD 457).

On June 3, 2013, Guare explained in an email to Shamma that the inspection "isn't good" and "HUD will be wanting to pull this HAP Contract in a heartbeat if the deficiencies noted are not taken care of by certain date."  (HUD 465).  Shamma responded, "We didn't have those items on prev report.  We will start repairs from this list.  Please tell them this is first real list we recvd as prev list we were given was from 2010 and we corrected the issues on that report."  (HUD 465).  Guare responded:

> That report is of new deficiencies – the old report was something to go off of, sure, but things happened between 2010 and 2013.  Things that should've been identified by visual inspection prior to the REAC.
>
> I had a long talk with HUD today about the property and they are not looking to renew this contract with you at this time.  They still do not have a major rehab. plan as requested originally and now with such a low score, they are looking to abate the contract.  That means the tenants would be given vouchers to move elsewhere and this property would become marked rent property.
>
> You will need to start thinking in that direction as I'm pretty sure HUD is not going to change their mind on this.  This is the 4th inspection this property has failed.  Even though you didn't own it for those other inspections, it is still a reflection on the faults of this property as a whole.

(HUD 465).  This email conversation was sent to Spurling, with an introductory comment from Guare: "Unbelievable.  After sharing the report with him and telling him how bad this really is . . . Look at his response below mine . . ."  (HUD 465).

Shamma wrote to Spurling later that day:

> I am asking out of fairness you allow us a change to correct the items on the new report.  We recvd a report from 2010 in which we corrected every single item on it prior to our inspection. . . .
>
> When we purchased the property neither karrie or prev owner told us there was any issue with inspections.  Come to find out it has been low scoring.  . . .

> I ask that you allow us a reinspection – now that we have current list of deficiencies.  Even if you give us reinspection in 2-4 weeks it will be all resolved.
>
> Please give us the chance to get reinspection.

(HUD 467).  On June 6, 2013, Shamma emailed Spurling again informing her that the day after the inspection the plumber started and the safety issues were resolved.  (HUD 473).  Shamma also informed Spurling that "[t]he remaining items from new report should all be completed within 2 weeks."  (HUD 473).  Shamma then asked: "I am correct to understand once we resolve all these items and reinspect we are able to continue the contract correct?"  (HUD 473).

On June 11, 2013, Shamma asked Guare about rent payments for May and June "which should have been paid before our inspection anyhow."  (HUD 475).  Guare responded that Spurling needed "a major rehab. plan / project improvement plan to move forward."  (HUD 474).  Shamma responded:

> Improvement plan?  We aren't improving building.  It's all occupied.  All we can do is literally correct all items on report.  Paint, plumbing, carpentry repairs of windows to make operable, cabinets all operable.

(HUD 474).  Guare forwarded this correspondence to Spurling, stating "I don't know how to explain it to him any further."  (HUD 474).

In a letter dated June 17, 2013 and emailed to Spurling, Shamma explained by way of background that "[a]fter purchase of the property known as Rockdale Apartments, we were informed that the property had low scores from 2010 on their inspection."  (HUD 479).  Shamma explained further that after correcting the items on the 2010 inspection report:

> I spoke with Bonnie and Eric with HUD a week prior to the reinspection (our first inspection as owners), and we discussed that the property had

8

> items that needed to be addressed.  I stated that we would correct all
> items on report, have inspection, and then any other new items we would
> correct right away.  That was agreed upon, and we have now a new report
> with items flagged with issues.  Within hours of received health and safety
> items, we corrected, and already other repairs have been underway and
> scheduled to bring issued items up to par.

(HUD 479).  Shamma explained that Plaintiff needs "its rents to continue with repairs

and continue updating the property."  (HUD 479).  Shamma requested "that you allow

us time and reinspection of property to prove we wish to continue to improve the

property and bring up to speed."

On June 20, 2013, Spurling acknowledged receipt of the letter and stated that a

"response will be sent shortly."  (HUD 481).  Shamma sent a follow up email on July 2,

2013 asking for an update and stating, "I look forward to the reinspection to prove what

we say is truthfully done."  (HUD 482).

In a letter dated July 11, 2013, William Hughes, the Director of Multifamily Project

Management in HUD's Columbus Office responded to Shamma's June 17th letter.

(HUD 488).  Hughes explained:

> A review of the letter reveals that it is insufficient to justify HUD allowing
> an assignment of the Housing Assistance Payments (HAP) Contract.  The
> letter does not address the specific locations of the items which need
> repair or replacement.   A specific timeframe for completion was not
> provided.  The letter did not provide an acceptable sources and uses of
> funds necessary to complete the repairs that were noted in the letter and
> the May 22, 2013 REAC inspection.
>
> The property has been sold without HUD approval.  The HAP Contract of
> record remains between Brican Properties LLC and the Department.  As
> you are not a party to the HAP Contract, you are not entitled to any
> payment under such contract.

(HUD 488).  Hughes also stated: "HUD will proceed with enforcement actions, including

but not limited to, the suspension, abatement and/or termination of the HAP Contract."

(HUD 488).

On July 16, 2013, Shamma responded to the letter from Hughes with a letter dated July 15, 2013.  (HUD 489).  In the letter, Shamma explained: "It is a complete shock that you mentioned we are not listed as the current owner of the above property nor party to this HAP contract after 3 months time from all signed paperwork being sent in."  (HUD 490).   Shamma detailed the history of the communications with HUD, including a May 13, 2013 conference call with Spurling and Eric Moore of HUD. Shamma states:

> During this call, they informed me that property was previously low scoring, and for some reason not had HUD inspection since 2010.  During this call, the plan agreed on was that we would correct all items from the 2010 reac inspection, which we did, then when the 2013 reac inspection occurred, we would get new list, and reinspect to find it brought up to acceptable standards.

(HUD 491).

On July 26, 2013, Shamma asked Guare if she could follow up with HUD because his emails to Hughes bounced back and Spurling "has not responded to any of my emails."  (HUD 494).

On August 20, 2013, Shamma asked Guare if "we just go ahead and fix all items on the la[s]t inspection  . . . would [Spurling] be able to tell u at least if that would solve all issues and we can move fwd?"  (HUD 497).  Guare responded, "No, that won't change anybody's mind.  They could care less I believe at this point – which is a real shame for those tenants."  (HUD 497).

On August 26, 2013, Shamma updated Spurling on the repairs made to the Property and stated, "we will submit for reinspection so you will see that we have done above and beyond for a project we have not recvd any rent for."  (HUD 498).

An internal memorandum dated September 26, 2013 shows that the Columbus Multifamily Hub requested approval for the notice of the abatement and intent to terminate the HAP Contract.  (HUD 499).  The memorandum states that relocation of the residents is being requested because the Property does not meet Housing Quality Standards.  (HUD 500).  The memorandum explains that no additional funds for relocation costs are needed because the relocation costs are estimated to be $50,000 and there is $64,064 remaining in the HAP Contact.  (HUD 500).

On October 14, 2013, Shamma again updated Spurling on the repairs completed.  (HUD 504).  Shamma asked that the rent funds be immediately released and stated that "[i]f HUD would like to send someone out to do reinspection (as originally they agreed too [sic]) they will see their items rectified and property back up to par (as we agreed)."  (HUD 504).  In an November 1, 2013 email sent to Spurling, Shamma repeated his interest in scheduling an inspection.  (HUD 505).

On November 13, 2013, HUD approved relocation assistance for the residents of the Property.  (HUD 507).  Accordingly, HUD sent notice to Brican and GWI informing them of HUD's decision to abate the Property's Section 8 housing subsidies, terminate the HAP Contract, and provide vouchers to the tenants.  (HUD 509).  This notice is not dated, but appears to be the final notice sent to Plaintiff.  The notice explains:

> As evidenced by the REAC inspections conducted on January 12, 2007, December 9, 2008, January 5, 2010 and May 23, 2013 which resulted in scores of 52c, 43c, 31c, and 13c, respectively.  In addition, you have failed to submit the required annual financial statements for the years ending December 31, 2010, December 31, 2011 and December 31, 2012. Finally, the real estate was sold without HUD knowledge and consent on April 1, 2013 resulting in the suspension of HAP voucher payments due to the unauthorized sale.  HUD has determined that the Owner remains in default of its HAP Contract because, notwithstanding the Notices and the Owner's and HUD's subsequent efforts with respect to the Project, the

Owner has failed to maintain the Project in a decent, safe, and sanitary condition as required by the Owner's HAP contract, 24 C.F.R. 5.703, and 24 CFR 886.123.  In addition, the owner has failed to submit the required annual financial statements required in paragraph 4 of the Assignment, Assumption and Amendment Agreement Section 8 Housing Assistance Payments Contract dated November 14, 2008.

(HUD 509) (hereinafter "Final Notice").

Plaintiff notes that despite termination of the HAP Contract, HUD continued to list the Property on its website as "approved."  (HUD 542).  Plaintiff explains that all but one of the tenants of the Property have terminated their leases.

Plaintiff brings a claim under the APA against HUD seeking judgment which would (a) reinstate and disgorge the housing assistance payments due under the HAP Contract; (b) permit Plaintiff an opportunity to correct the results of the May 23, 2013 inspection and/or re-inspect the Property to confirm that Plaintiff has corrected all deficiencies noted in this report; (c) approve the March 28, 2013 HAP Contract Assignment to Plaintiff; (d) rescind termination of the HAP Contract; and (e) honor the HAP Contract with respect to the tenancies two of the tenants.  In addition, Plaintiff claims that HUD should be estopped from denying Plaintiff either the assignment of the HAP Contract or from withholding payments under the HAP Contract.

## II.  ANALYSIS

### A. Standard of review

As this Court has explained, "under the Administrative Procedure Act ("APA"), when a district court is reviewing final agency action, the usual rules governing summary judgment do not apply." *Integrity Gymnastics & Pure Power Cheerleading, LLC v. United States Citizenship & Immigration Servs.*, 131 F. Supp. 3d 721, 725-26 (S.D. Ohio 2015) (citing *City of Cleveland v. Ohio*, 508 F.3d 827 (6th Cir. 2007); *North*

*Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 518 F.Supp.2d 62 (D.D.C. 2007)). "Instead, a district court's review is limited to whether the agency's action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* (quoting 5 U.S.C. § 706(2)(a) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be—arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.")).

   **B. Motion to Strike**

   HUD moves to strike the Affidavit of Rasheed Shamma, which was filed in support of Plaintiff's Motion for Summary Judgment. HUD explains that in reviewing Plaintiff's claim under the Administrative Procedure Act, the Court's review is limited to the agency's administrative record.

   In determining whether an agency's action was arbitrary, capricious, or an abuse of discretion, a court is generally limited to reviewing "the administrative record, which includes materials compiled by the agency at the time its decision was made." *Southern Forest Watch, Inc. v. Jewell*, 817 F.3d 965, 977 (6th Cir. 2016) (quoting *Latin Ams. for Soc. & Econ. Dev. v. Adm'r of the Fed. Highway Admin.*, 756 F.3d 447, 464-65 (6th Cir. 2014)). "Supplementation of the administrative record may be appropriate 'when an agency has deliberately or negligently excluded certain documents from the record, or when a court needs certain 'background' information to determine whether the agency has considered all relevant factors.'" *Id.* (quoting *Latin Ams. for Soc. & Econ. Dev.*, 756 F.3d at 465).

   Plaintiff explains that the Affidavit of Rasheed Shamma is for background information to aid this Court in better understanding the existing administrative record

and determine whether the administrative record was accurate.  HUD responds that except for two emails, all the documents attached to the affidavit are a part of the administrative record.  The Court concludes that there is nothing in the record showing that HUD deliberately or negligently excluded these two emails, or that these emails were ever provided to HUD.

HUD explains that in the affidavit, Shamma states that HUD employees told him that HUD would re-inspect the Property if deficiencies were found during the May 2013 inspection, and that HUD would approve the assignment of the HAP Contract if Plaintiff corrected the deficiencies identified in the 2013 inspection.  However, oral communications and conversations cannot be included in an administrative record unless there was some documentation of those communications.  *Southern Forest Watch*, 817 F.3d at 977.[1]  Therefore, HUD's Motion to Strike the Affidavit of Rasheed Shamma is granted.

## C. Administrative Procedures Act

The Administrative Procedure Act ("APA") provides for judicial review of final agency actions.  *Sierra Club v. United States Forest Serv.*, 828 F.3d 402, 407 (6th Cir. 2016) (citing 5 U.S.C. § 702).  The APA provides in relevant part:

> The reviewing court shall—
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or]
>
> . . .

---

[1]The Court notes that Shamma refers to these same conversations in his July 15, 2013 letter to HUD, which is a part of the administrative record.  (HUD 491).

(D) without observance of procedure required by law

5 U.S.C. § 706.

In cases arising under § 706(2)(D)(A), a decision is arbitrary or capricious under the APA if the agency:

> has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007) (quoting *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

*Sierra Club v. United States Forest Serv.*, 828 F.3d 402, 407 (6th Cir. 2016). As a practical matter, the same standard has been applied in cases arising under § 706(2)(D). *See Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 370-71 (6th Cir. 2010) (explaining that "the question whether a certain procedure is required in a particular circumstance, or whether a certain methodology satisfies the procedure, is often left to the agency's discretion . . . So even in cases arising under § 706(2)(D), the arbitrary-and-capricious standard frequently governs.").

Plaintiff claims that HUD violated the APA when it abated and withheld payments due under the HAP Contract; failed to permit Plaintiff the opportunity to correct certain material deficiencies to the Property; failed to properly review and approve Plaintiff's request to transfer the HAP Contract; and terminated the HAP Contract.

**1. <u>Claims based on the HAP Contract</u>**

Plaintiff claims that HUD violated the APA when it abated and withheld payments due under the HAP Contract and when it terminated the HAP Contract. However, Plaintiff was not a party to the HAP Contract, and therefore to the extent that Plaintiff

brings a claim based on a breach of the HAP Contract itself, that claim cannot serve as basis for a claim under the APA.

Instead, the HAP Contract provides the requirements for assignment: "HUD will approve a change of ownership during the term of this Contract only if the purchaser demonstrates, to HUD's satisfaction, an ability to administer this Contract and agrees to carry out all terms of this Contract." (HUD 6).

In its Motion for Summary Judgment, HUD maintains that Plaintiff failed to demonstrate to HUD's satisfaction that it would be able to administer the HAP Contract and carry out all the terms of the HAP Contract. HUD points out that by late April 2013, Plaintiff had not yet submitted the required information to HUD. (HUD 379-380). HUD explains that a June 2013 email shows that Plaintiff still had not submitted a plan for physical repairs or improvements to the Property. (HUD 465). HUD maintains that when the plan was finally submitted, it was comprised of a single page and failed to identify the specific items that would be repaired and replaced, did not provide a timeframe for completion, and did not provide any documentation of what available funds would be used to complete the necessary repairs. (HUD 479, 488). HUD also notes that the plan stated that Plaintiff would not implement the plan until after HUD approved assignment of the HAP Contract and began paying the Section 8 housing subsidies to GWI. (HUD 488).

Plaintiff does not dispute that it provided incomplete or incorrect information to HUD, but instead blames HUD for failing to inform Plaintiff that the change of ownership would not be approved without the paperwork. However, the record shows that Spurling informed Plaintiff on March 27, 2013, that:

> We cannot process a new direct deposit form without the HAP Assignment process being completed. This is the FIRST notification that we have received of a possible change in ownership. As Mr. Sebastian knows, the HAP funds cannot be paid to other than the owner of record who must also be the ownership entity listed on the HAP Contract in effect.

(HUD 182). On April 18, 2013, Spurling emailed Shamma and repeated her instructions regarding the necessary paperwork, attached several HUD handbooks, and referred Shamma to training and websites for owners and agents. (HUD 197). Spurling closed the email by stating:

> A Physical Improvement Plan is also needed due to the failing REAC physical inspections.

> Until all of the above items are received, we cannot process the request to transfer the HAP Contract.

(HUD 197). On April 22, 2013, Spurling reminded Guare and Shamma of "the items relative to the purchaser as outlined in the 4/18/13 to Rasheed Shamma" and stated once more that HUD "cannot process the request until all of the required documents have been submitted for review." (HUD 357). On April 26, 2013, Spurling informed Shamma and Guare of the same. (HUD 379-380) ("No further review may be completed until the revised documents noted above have been submitted."). Therefore, the record does not support Plaintiff's contention that the change of ownership would not be approved without the paperwork.

Plaintiff makes a related argument that Plaintiff was never informed that the HAP Contract would not be transferred if Plaintiff did not provide HUD with Brican's financial information. However, the record shows that Plaintiff was aware that Brican had failed to submit the required annual financial statements. On April 24, 2013, Shamma stated in a letter provided to Spurling: "We understand that the previous owner was not up to

17

speed on their financials; we have our own accountant and CPA's that keep our accounts in order."  (HUD 360).  The record also shows that Plaintiff was informed that the financial statements were a requirement for the assignment of the HAP Contract.  In the attachments Spurling sent to Shamma on April 18, 2013, there are multiple references in the materials regarding the required financial information.  For example, one of the items on the Transfer of Physical Assets Full Review Final Approval Checklist is "interim audited financial statement from the date of the last audited report to date of transfer."  (HUD 213).  Moreover, on April 18, 2013, Shamma submitted a "Assignment, Assumption and Amendment Agreement Section 8 Housing Assistance Payments Contract" which was signed by himself and Brican.  (HUD 193-195).  The Agreement provided that the Buyer is responsible for the filing of the Annual Financial Statement from the date of the Agreement through the end of the Buyer's fiscal year, but "the Seller shall remain responsible for filing the AFS through the day before this Agreement if said HAP Contract includes an AFS filing requirement."  (HUD 194).  The Agreement also states in paragraph 4: "The Owner shall comply with the Uniform Financial Reporting Standards requirements of 24 CFR Part 5, Subpart H, including any changes in the regulation and related requirements during the term of the HAP Contract."  (HUD 194).  These regulations require that owners of multifamily projects receiving direct or indirect assistance from HUD file annual financial statements.  24 C.F.R. § 5.801(c).  Therefore, Plaintiff knew that the filing of the annual financial statements, either by itself of Brican, was required for the assignment of the HAP Contract.

Given the evidence of the notice Plaintiff received regarding the requirement to

submit the requested information, the Court cannot conclude that HUD's decision to abate and terminate the HAP Contract based on the failure to submit required annual financial statements was arbitrary and capricious.  There is nothing in the record which indicates that HUD "relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Sierra Club v. United States Forest Serv.*, 828 F.3d 402, 407 (6th Cir. 2016).  Moreover, in the Final Notice, HUD states a second reason for its decision to abate with the intent to terminate the HAP Contract: the failed REAC inspections.

### 2. <u>Reinspection</u>

While Plaintiff does not dispute the findings of the May 22, 2013 inspection or the previous failed inspections, Plaintiff maintains that HUD violated the APA by failing to permit Plaintiff the opportunity to correct certain material deficiencies to the Property and HUD made no efforts to re-inspect the Property after the repairs had been completed.

HUD responds that the notice of the inspection sent on April 25, 2013 did not state that there would be an opportunity to have the property reinspected.  (HUD 372-73).

Plaintiff references conversations detailed in a letter from Shamma dated June 17, 2013 and emailed to Spurling.  (HUD 479).  In the letter Shamma states: "I spoke with Bonnie and Eric with HUD a week prior to the reinspection (our first inspection as owners), and we discussed that the property had items that needed to be addressed.  I

stated that we would correct all items on report, have inspection, and then any other new items we would correct right away." (HUD 479). Shamma asked HUD "to allow us the time and reinspection of property to prove we wish to continue to improve the property and bring up to speed." (HUD 479). On July 11, 2013, William Hughes, Director of Multifamily Project Management in HUD's Columbus Office, responded to Shamma's June 17th letter and explained:

> A review of the letter reveals that it is insufficient to justify HUD allowing an assignment of the Housing Assistance Payments (HAP) Contract. The letter does not address the specific locations of the items which need repair or replacement. A specific timeframe for completion was not provided. The letter did not provide an acceptable sources and uses of funds necessary to complete the repairs that were noted in the letter and the May 22, 2013 REAC inspection.

(HUD 488).

The Court concludes that this explanation as why HUD denied Plaintiff's request for a reinspection demonstrates that HUD's decision was not arbitrary or capricious. "So long as the agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action,' we will not set aside its decision." *Kentucky Coal Ass'n, Inc. v. Tennessee Valley Auth.*, 804 F.3d 799, 801 (6th Cir. 2015) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

As detailed above, Plaintiff was notified on April 18, 2013 in an email from Spurling to Shamma that HUD needed certain information and that "[a] Physical Improvement Plan is also needed due to the failing REAC physical inspections." (HUD 197). Spurling also told Shamma: "Until all of the above items are received, we cannot process the request to transfer the HAP Contract." (HUD 197). Spurling reiterated that

this information was necessary several times before the May 22, 2013 inspection. After

the inspection, in an June 3, 2013 email, Guare explained to Shamma:

> I had a long talk with HUD today about the property and they are not
> looking to renew this contract with you at this time. They still do not have
> a major rehab. plan as requested originally and now with such a low
> score, they are looking to abate the contract. That means the tenants
> would be given vouchers to move elsewhere and this property would
> become marked rent property.
>
> You will need to start thinking in that direction as I'm pretty sure HUD is
> not going to change their mind on this. This is the 4th inspection this
> property has failed. Even though you didn't own it for those other
> inspections, it is still a reflection on the faults of this property as a whole.

(HUD 465). This email conversation was sent to Spurling. (HUD 465). A few days

later, on June 11, 2013, Shamma asked Guare about rent payments for May and June,

and Guare responded that Spurling needed "a major rehab. plan / project improvement

plan to move forward." (HUD 474). Shamma responded:

> Improvement plan? We aren't improving building. It's all occupied. All we
> can do is literally correct all items on report. Paint, plumbing, carpentry
> repairs of windows to make operable, cabinets all operable.

(HUD 474). Guare forwarded this correspondence to Spurling, stating "I don't know

how to explain it to him any further." (HUD 474).

While Shamma's June 17, 2013 letter does detail some plans to make repairs,

the letter also states that Plaintiff "needs its rents to continue with repairs and continue

updating the property to the satisfaction of HUD." (HUD 479). However, HUD had

made it clear that it would not approve the assignment of the HAP Contract and the

payments due under the Contract until it received the necessary information, including a

plan for improving the Property. Given Plaintiff's reluctance to produce such a plan, it

was not arbitrary and capricious for Hughes to state in his July 11, 2013 letter that

Shamma's June 17, 2013 letter was "insufficient to justify HUD allowing an assignment of the Housing Assistance Payments (HAP) Contract." (HUD 488). While Hughes' letter does not specifically reject a reinspection, this Court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 2867, 77 L. Ed. 2d 443 (1983) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286, 95 S. Ct. 438, 442, 42 L. Ed. 2d 447 (1974)).

### 3. Review of request to transfer the HAP Contract

Plaintiff argues that HUD failed to properly review and approve Plaintiff's request to transfer the HAP Contract. Specifically, Plaintiff cites the fact that the repairs were made was not disclosed to all decision-makers regarding the termination; HUD did not terminate the HAP Contract following the earlier failing inspections; and no opportunity was provided for any further review of HUD's decision to terminate the HAP Contract and withhold payments.

The Court finds that there is evidence in the record that the decision-makers were aware that Plaintiff had made repairs and had offered to make additional repairs. As explained above, Shamma's June 17, 2013 letter details repairs already made and plans to make additional repairs. (HUD 479). However, a HUD document entitled "Checklist for Compliance, Disposition, and Enforcement (CDE) Plan" ("CDE Plan Checklist") explains the history of the Property:

> Mr. Sebastian had indicated an interest to sell the property. Several potential purchasers had contacted this office for information relative to the existing HAP Contract, physical condition and steps needed to secure an Assignment of the HAP. The actual purchaser, Global Wealth Investments, Inc. (GWI), did not contact HUD prior to the purchase. The management agent of record reported the sale of the property on April 2,

> 2013, the day after the sale. This office immediately suspended future HAP voucher payment due to the fact that the owner of the real estate (confirmed by the Hamilton County Auditor's webpage) is not the entity with which HUD entered into the HAP Contract. A conference call was held with Eric Moore, Chicago DEC, Bonnie Spurling and Mr. Rasheed Shamma, principal of GWI. GWI was informed of the previous failing REAC scores. In addition, he was provided with the list of documents and information needed to be submitted for an Assignment of HAP to be considered. Mr. Shamma's response relative to the physical condition was simply that his maintenance staff would correct any outstanding issues.

(HUD 502). The CDE Plan Checklist then explained that many of the items which resulted in "major point reductions" in the REAC inspection conducted on May 22, 2103 were "repeat findings from the prior inspections." (HUD 502). The CDE Plan Checklist recognized that "GWI has requested that HUD allow them the opportunity to make the repairs noted in the 5/23/13 REAC." (HUD 502). However, it was also noted that "[t]he history of four (4) failing REAC's does not present itself to additional time for the old or new owner to make repairs at this time." (HUD 502). In the Final Notice, HUD concluded: "HUD has determined that the Owner remains in default of its HAP Contract because, notwithstanding the Notices and the Owner's and HUD's subsequent efforts with respect to the Project, the Owner has failed to maintain the Project in a decent, safe, and sanitary condition as required by the Owner's HAP contract, 24 C.F.R. 5.703, and 24 C.F.R. 886.123." (HUD 509). This decision was not arbitrary and capricious.

In the CDE Plan Checklist, HUD has explained why it did not terminate the HAP Contract after the earlier failed inspections and only decided to terminate the HAP Contract after the failed inspection on May 22, 2013:

> The property's last passing REAC inspection was 10/22/04 with a score of 60c. The last four (4) REAC scores have declined each time (1/07 52c, 12/08 43c, 1/10 31c and 5/13 13c). The residents are not being provided decent, safe and sanitary housing as evidenced by the numerous failing

REAC scores. The owner's [sic] continue to allow the property to remain in poor condition. The fact that many of the findings have been on prior REAC inspection reports is an indication of the owners' inability and/or unwillingness to maintain the property. The fact that the two prior owners chose to sell the real estate without HUD knowledge and approval of the transfer of the HAP Contract at the time of the failing REAC inspections, is a further indication that there is a systematic problem either due to excessive non-HUD financing or lack of available funds of the owners.

(HUD 502). In the summary, HUD states:

The past owners' responses to the failing REAC scores have been to sell the property rather than address the physical needs of the property. The current owner of the real estate was informed of the process and the documents needed to process a request to assign the HAP Contract, he has failed to provide the needed documents and information. Finally, the purchaser indicated that his maintenance staff would ensure that all physical items had been properly addressed, yet the REAC inspection resulted in a score of 13c.

(HUD 503). Based on the history of the failed inspections combined with the failed inspection of May 22, 2012, it was decided that the Columbus office would issue a Notice of Abatement with Intent to Terminate. (HUD 503). The Court finds that this decision was not arbitrary and capricious.

Finally, Plaintiff argues that it was arbitrary and capricious for HUD to fail to provide any further review of its decision to terminate the HAP Contract and withhold payments. However, as illustrated above, the record contradicts Plaintiff's contention that he was not afforded an opportunity to convince HUD that based upon his efforts to repair and resolve the deficiencies, the HAP Contract should not be terminated. The Final Notice explains that despite "subsequent efforts" the Owner has "failed to maintain the Project in a decent, safe and sanitary condition." (HUD 509). This Court must apply deference to an agency's final decision. *See Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 370 (6th Cir. 2010) (explaining "that the question of whether a certain procedure is

required in a particular circumstance, or whether a certain methodology satisfies the procedure, is often left to the agency's discretion").

### D.  **Estoppel**

Plaintiff maintains that from the day Plaintiff became interested in purchasing the Property, HUD took every opportunity to create fictitious hoops and barricades to deceive Plaintiff into believing that it would transfer the HAP Contract. Even though Plaintiff notified HUD of the impending sale and transfer of the HAP Contract prior to the closing, HUD never told Plaintiff that the assignment of the HAP Contract could not be accomplished or that it was at risk of abatement or termination.

As one district court has explained:

> The standard for enforcing estoppel against the federal government is high.  Estoppel is not available against the government on the same terms as against private parties.  Ordinarily the acts of individual officers and agents of the government do not give rise to estoppel.  As the Sixth Circuit observed in *United States v. Guy*, "at a very minimum some affirmative misconduct by a government agent is required as a basis for estoppel."  A party attempting to estop the government has a heavy burden.

New Trier Mortgage Corp. v. U.S. Dep't of Hous. & Urban Dev., 252 F. Supp. 2d 446, 456 (N.D. Ohio 2002) (citations omitted).

After Plaintiff notified HUD of the upcoming closing for the sale of the Property, HUD informed Plaintiff that HUD's approval was necessary for assignment of the HAP Contract.  (HUD 182).  Despite Plaintiff's efforts, HUD did not grant approval.  There is no evidence of affirmative misconduct.  To the contrary, the HUD employees notified Plaintiff of the previous failing REAC scores and provided Plaintiff on multiple occasions with the list of documents which were necessary for HUD to consider the assignment of the HAP Contract.  Therefore, the Court concluded that HUD should not be estopped

from denying Plaintiff the relief it seeks.

**III.** **CONCLUSION**

Based on the foregoing, it is hereby **ORDERED** that:

1. Defendant HUD's Motion to Strike the Affidavit of Rasheed Shamma (Doc. 31) is GRANTED;

2. Plaintiff Global Wealth Investments, Inc.'s Motion for Summary Judgment (Doc. 28) is DENIED;

3. Defendant Secretary, Department of Housing and Urban Development's Motion for Summary Judgment (Doc. 39) is GRANTED; and

4. Because it appears that there are no remaining claims pending before this Court, this matter is CLOSED and TERMINATED from the active docket of this Court.

**IT IS SO ORDERED.**

*/s/ Michael R. Barrett*
JUDGE MICHAEL R. BARRETT
